UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **04-80295**

SIGNATURES NETWORK, INC.,

    Plaintiff,

vs.

**CIV-RYSKAMP**

SLIPKNOT MERCHANDISING L.L.C.,
an Iowa limited liability company; JOHN
DOES 1-10 and XYZ COMPANY,

**MAGISTRATE JUDGE VITUNAC**

    Defendants.

## COMPLAINT

Plaintiff SIGNATURES NETWORK, INC., by its attorneys, files this Complaint against Defendants, alleging as follows:

### JURISDICTION AND VENUE

1. This action arises under the Lanham Trademark Act 15 U.S.C. §§1051 et seq. (the "Lanham Act"). Accordingly, this Court has federal question jurisdiction over the subject matter of this action pursuant to U.S.C. §§1338(a)(b), and has pendent jurisdiction over any state law claims asserted herein.

2. Venue in this district is proper under 28 U.S.C. §1391(b).

### THE PARTIES

3. Signatures Network, Inc. ("Plaintiff" or "SNI") is a California corporation with its principal place of business in San Francisco, California. Signatures Network, Inc. ("SNI") is a merchandising business that holds the rights to market and license over 125 artists, celebrities and entertainment properties. Its services range from tour to retail, online sales to wholesale, and

Case 9:04-cv-80295-KLR   Document 1   Entered on FLSD Docket 03/31/2004   Page 2 of 13

include a full range of licensing functions.

4. Slipknot Merchandising LLC ("Slipknot Merchandising") is an Iowa limited liability company, whose principal place of business is located at 10345 West Olympic Boulevard, Los Angeles, California. Slipknot Merchandising is an entity licensing merchandising rights for the musical group known as Slipknot (collectively "Slipknot").

5. Defendants John Does 1-10 and XYZ Company are sued herein under fictitious names because their true names and capacities are unknown at this time. This Complaint will be amended when their true names and capacities are ascertained.

6. Upon information and belief, the Defendants will be present in and about the Southern District of Florida in connection with the claims asserted below and are and will be subject to the jurisdiction of this Court and will be immediately leaving the jurisdiction in order to continue the violations of federal law described below.

7. Defendants, and each of them, are individuals and business entities who, upon information and belief, are acting in concert and active participation with each other in committing the wrongful acts alleged herein.

## NATURE OF THE ACTION

8. Plaintiff, SNI has an exclusive license to market and sell all of the merchandise relating to a very popular alternative rock group, Slipknot. Slipknot through its counsel first advised SNI two (2) days ago, that it was using a new merchandising company to sell all the licensed products. Yesterday, the 2004 North American Tour of Slipknot began in Orlando. When SNI arrived with its merchandise at the concert venue, they were escorted off the premises by security at the direction of Slipknot's representative. Third parties sold the merchandise before, during and after the concert and indicated their intention to sell the merchandise through

- 2 -

the remainder of the North American Tour, which ends September 4, 2004. Each concert provides a limited and unique opportunity to capitalize on the exclusive licensing agreement as the band has not toured North America for some time.

9. The next scheduled concert is this evening, March 31, 2004, at Sound Advice Amphitheater in West Palm Beach, Florida. It is anticipated that the concert will be sold out and well-received. Plaintiff seeks to enjoin the new third party merchandisers from selling licensed products at the concert venues tonight and for the remainder of the North American Tour schedule. Plaintiff seeks to maintain the status quo and allow it to sell its merchandise at the concert venues scheduled as originally planned.

## GENERAL ALLEGATIONS

### The Exclusive Licensing Agreement

10. On or about September 26, 2000, Slipknot Merchandising and Winterland Concessions Company, a California corporation doing business as Winterland Productions, and now known as WRC, Inc., ("Winterland") entered into a written Tour/Retail/Licensing-Agency Agreement (the "Slipknot Agreement"), pursuant to which Slipknot Merchandising granted to Winterland the exclusive right to utilize certain "Licensed Property" (as that term is defined therein) of the musical group Slipknot and the group's individual members in connection with the manufacture, advertisement, distribution and sale of certain products utilizing the Licensed Property. Because of a confidentiality provision contained in the Slipknot Agreement, SNI has not attached a copy of the Slipknot Agreement to this Complaint. (SNI is simultaneously herewith filing under seal a copy of the Slipknot Agreement).

### SNI OBTAINS RIGHTS TO ENFORCE THE COPYRIGHT UNDER THE WINTERLAND BANKRUPTCY CASE

11. On or about January 2, 2001, Winterland filed a chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the Northern District of California (the "Bankruptcy Court")

under Case No. 01-40008-N-11 (the 'Bankruptcy Case").

12. On or about September 20, 2001, Winterland and its affiliated debtor, Concert Concessions Corporation ("CCC"), filed a Notice of Motion and Motion by Debtors for Authority to Assume and Assign Certain Executory Contracts and Leases Free and Clear of Liens and. Interests, and for Authority to Reject Certain Contracts (the "365 Motion") pursuant to Bankruptcy Code § 365. Among other things, the 365 Motion sought the Bankruptcy Court's authority to assume and assign the Slipknot Agreement to a third party.

13. On September 20, 2001, Winterland also filed a Motion for Order Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens and Interests pursuant to Bankruptcy Code § 363 (the "363 Motion").

14. On or about December 5, 2001, Winterland and CCC, as sellers, and SNI, as buyer, entered into an asset purchase agreement (the "Asset Purchase Agreement"), pursuant to which Winterland and CCC agreed, *inter alia*, to sell to SNI substantially all of their assets (collectively, the "Acquired Assets") pursuant to Bankruptcy Code § 363. Section 1.2 of the Asset Purchase Agreement provided in pertinent part:

> Seller shall, at Closing, sell, transfer and assign to Buyer, and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest, as of the Closing Date, in and to all of the following assets of Seller related to, or used in conjunction with, the Business... (a) All licenses, contracts or agreements with respect to the Business to which Seller is a party that are identified in Schedule 1.2(a) hereto ... including all trademark and exploitation rights related thereto, and any and all sublicenses derived therefrom...

Schedule 1.2(a) to the Asset Purchase Agreement identifies Slipknot Merchandising by "Contracting Party" (Slipknot Merchandising L.L.C.) and by "Artist" name (Slipknot) and lists the Slipknot Agreement as one of the contracts being assumed by Winterland and assigned to SNI.

15. On or about December 12, 2001, the Bankruptcy Court approved Winterland's

and CCC's motion to sell the Acquired Assets to SNI, and authorized them to close the transaction with SNI immediately. On or about December 13, 2001, Winterland and CCC sold the Acquired Assets, including the Slipknot Agreement, to SNI.

## THE BACKGROUND OF THE ACTION

16. Under the Asset Purchase Agreement, Winterland assigned all of its right, title, and interest in and to the Slipknot Agreement to SNI.

17. The Slipknot Agreement provides SNI with the exclusive right to utilize and exploit the Licensed Property (which includes, among other things, the name, symbols, likenesses, service marks and trademarks of Slipknot and its members on Licensed Product (which includes, among other things, wearing apparel (hats, t-shirts, sweatshirts, etc.), accessories, buttons and programs) at any and all live concerts given by Slipknot throughout the world (hereinafter the "Merchandising Rights").

18. The Slipknot Agreement is still in force and effect. At all relevant times, SNI has stood ready to perform its assumed obligations under the Slipknot Agreement and to enforce its exclusive rights as to the Licensed Property.

19. On March 18, 2004, Plaintiff filed a complaint in the Superior Court of California, Los Angeles, Case No. BC312376 in order to resolve, among other things, certain disputes that SNI and Slipknot had relating to Slipknot's failure to cooperate with SNI's efforts to engage in merchandising activities for a concert that was set to commence on March 30, 2004. Regardless of such failures by Slipknot, SNI has always intended to perform its obligations under the Slipknot Agreement including with respect to the current tour. To that end, SNI assembled an inventory of Licensed Products to sell during the current tour. On March 29, 2004, SNI received a letter from Slipknot's litigation counsel who admits that Slipknot has engaged "a new

merchandising representative". This was the first time that SNI became aware that Slipknot had intended to preclude SNI from participating in merchandising activities during the current tour.

20. On March 30, 2004, SNI's representative appeared at the Hard Rock Cafe in Orlando, Florida with a truck filled with 48 boxes of SNI Products related to Slipknot (that constitutes the Licensed Products under the Slipknot Agreement) to sell at the first concert venue of the 2004 U.S. Tour of the band Slipknot and pursuant to the Slipknot Agreement. March 31, 2004 Declaration of Robb Feinstein ("Feinstein Dec.").

21. However, the production manager for the venue after speaking with Slipknot's tour manager, Ken Denson, escorted the SNI representative off the premises with a security guard and informed him that Slipknot was selling Slipknot merchandise at the concert through another company. *Id.* SNI is informed and believes that the company that sold Slipknot merchandise at the March 30, 2004 concert was Bravado.

22. Slipknot is scheduled to play in West Palm Beach, Florida on March 31, 2004, and SNI has been informed that merchandise falling under the Licensed Products of the Slipknot Agreement will be sold by Bravado, the same company that sold these items at the Orlando concert.

23. Slipknot is scheduled as per their website to tour approximately 49 venues throughout the U.S. and a number of venues outside the U.S. through September 4, 2004. The last concert of the tour is scheduled on September 4, 2004, to take place at the Sound Advice Ampitheater **in West Palm Beach, Florida.**

24. Plaintiff is engaged in the manufacture, distribution and sale of various types of merchandise sold and distributed at concerts and at retail stores of musical performing artists and groups, including, but not limited to, tour and program books, T-shirts, jerseys, sweatshirts, hats,

visors, buttons and posters which embody the trademarks, service marks, trade names, likenesses, images and tour logos of various musical performers and groups.

25. The exclusive licensing rights under the Slipknot Agreement are of significant value and the Licensee's ability to capitalize upon these rights is largely dependent upon the marketing and sale of the Licensed Products at or around the concert venues of the Slipknot 2004 US Tour.

## DEFENDANTS' UNLAWFUL CONDUCT

26. Pursuant to the Slipknot Agreement, SNI has exclusive right to utilize the names, symbols, emblems, names, likenesses, service marks, and/or trademarks and to the extent that they are controlled by Slipknot, the designs, visual representations and/or copyrights and graphic designs of the musical group, Slipknot and the individual members thereof.

27. Slipknot has used its mark for nearly eight years to identify it in all phases of the entertainment industry and to distinguish it from all other such artists. The mark "Slipknot" is a federally registered trademark: Registration No. 2566448 for use in connection with series of pre-recorded CD-Roms, compact discs, DVDS, audio cassettes, phonograph albums and videotapes, featuring music; Registration No. 2568946 for use in connection with T-shirts, sweatshirts, long sleeve shirts, ski hats, baseball caps, hockey jerseys and jackets; and Registration No. 256447 for use in connection with entertainment services, namely, live performances by a musical group.

28. Due to the number of years of use and active marketing, the Slipknot trademark has developed substantial and valuable goodwill in the minds of consumers throughout the United States and the world for that matter.

29. Further, both Slipknot Merchandising and SNI have "embarked on a program to

stem the flow of unauthorized merchandise and to maximize the distribution of legitimate Licensed Products".

30. By their agreement, Slipknot Merchandising and SNI agree that it is the express intent for SNI to manufacture, advertise, distribute and/or sell Licensed Products through various distribution methods, including normal retail channels and to license others to manufacture, advertise, distribute and/or sell additional licensed products.

31. Pursuant to its contractual rights, SNI may, if it so desires, commence or prosecute any claims or judgments in its own name or in the name of Slipknot Merchandising in order to enforce its exclusive rights to utilize the Slipknot name, marks and likenesses and market and sell the Licensed Products.

32. On information and belief, Defendants intend to market and sell T-shirts, jerseys, caps and/or other merchandise and other Licensed Products in the vicinity of each of the concert venues before, during and after the groups' performances, and at subsequent concerts during the 2004 Slipknot US Tour.

33. The merchandise sold by the Defendants is of the same general appearance as the Licensed Products that Plaintiff markets and distributes. The merchandise is likely to cause confusion among prospective purchasers. However, it is not known whether the merchandise is of the same quality that SNI uses, and an inferior quality merchandise will irreparably harm SNI.

34. Moreover, the preclusion of SNI to market and sell the Licensed Products in the concert venues will irreparably harm Plaintiff as the limited concert venues provide a unique and highly lucrative opportunity for SNI to profit from its exclusive licensing rights and it would be difficult to quantify the damage sustained to SNI because of its lost opportunity.

35. SNI seeks to enforce its exclusive rights and to enjoin the unauthorized sale of

merchandise by third parties, including the John Does and XYZ Company.

36. The aforesaid acts by Defendants and others are likely to cause the purchasing public to believe that Defendants are authorized, sponsored or approved to sell the Licensed Products. Plaintiff is irreparably harmed in that it will be unable to exploit the unique and exclusive intellectual property rights which were granted to them under the Slipknot Agreement.

37. The aforesaid manufacture, distribution and sale of merchandise bearing the names, trademarks and/or likenesses of Slipknot and its individual members constitutes a false designation of the source of origin of such goods and falsely describes and represents such merchandise. The use by Defendants and others of Slipknot's Trademark also constitutes an attempt to palm off and appropriate to themselves Slipknot's and Plaintiff's exclusive rights therein.

38. Upon information and belief, Defendants and others have and will continue to engage in such unauthorized activities in this state and elsewhere in interstate commerce and are likely to continue such activities throughout the Tour, to the great injury of Plaintiff.

39. Plaintiff has no adequate remedy at law and will suffer irreparable harm and damage as a result of the aforesaid acts, in an amount presently incalculable.

### FIRST CLAIM FOR RELIEF

(Violation of the Lanham Act)

40. Plaintiff realleges each allegation set forth in paragraphs 1- 39 above, inclusive.

41. By reason of the foregoing, Plaintiff hereby asserts a claim against Defendants for injunctive and monetary relief pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a), with regards to the false designation of origin and false descriptions and representations in

commerce of Defendants' merchandise.

## SECOND CLAIMS FOR RELIEF

(Infringement of Registered Trademarks)

42. Plaintiff realleges each allegation set forth in paragraphs 1- 39 above, inclusive.

43. By reason of the foregoing, Plaintiff hereby asserts a claim against Defendants for injunctive and monetary relief pursuant to 15 U.S.C. §1114, with respect to Defendants' infringement of the registered mark.

## THIRD CLAIM FOR RELIEF

(Violation of Florida Common Law Trademark Infringement)

44. Plaintiff realleges each allegation set forth in paragraphs 1- 39 above, inclusive.

45. Plaintiff has exclusive rights to use the service marks and/or trademarks as stated.

46. Through its association with such services or goods, Plaintiff's trademark has acquired a special significance as the name of the Artist, Slipknot, and because this trade name is inherently distinctive, it has by actual use acquired a certain secondary, special trade meaning as indicating, describing, of identifying the band, Slipknot, as the source of certain goods.

47. Defendants have commenced to use identical trade names and marks to identify similar goods in competition with Plaintiff in the same trade area.

48. As a consequence of Defendants' actions and continued threatened actions, customer confusion of the sponsorship of the goods offered is probable and inevitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks relief against Defendants, and each of them, as follows:

1. That Defendants, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons acting in concert with them, be enjoined in this and all judicial

districts in the United States, preliminarily during the course of this litigation and permanently from:

(a) manufacturing, distributing, selling, offering for sale, holding for sale, advertising, importing and/or exporting any products, merchandise or goods bearing the names, trademarks, or likenesses of Slipknot or its individual members or any colorable variation or imitation thereof or any other goods constituting Licensed Products under the Slipknot Agreement;

(b) representing that any products, merchandise or goods manufactured, distributed, sold, held for sale, imported, exported, and/or advertised by them is sponsored or authorized by Slipknot or in any manner likely to cause others to believe that they are associated with plaintiff, in this district or in any other district in which Plaintiff seeks to enforce this Court's injunction order.

(c) taking any actions that interfere with SNI's ability to distribute, sell, offer for sale or otherwise exploit Licensed Products in and around concert venues under the Slipknot Agreement, including without limitation, barring or causing to bar SNI or its representatives access to venues where Slipknot concerts take place.

2. That this Court order the United States Marshal, the local and state police or sheriff, off duty officers of the same, authorized agents of Plaintiff, and/or any persons acting under their supervision to seize and impound any and all merchandise, which the Defendants attempt to sell, distribute or hold for sale at, within or in the vicinity of the arenas at which the Artist is performing, whether this occurs before, during or after the concerts on the Tour.

3. That Defendants pay to Plaintiff damages in an amount to be determined.

4. That Plaintiff be awarded its costs, attorney's fees and such other and further

relief as the Court deems to be just and proper.

Dated: March 31, 2004

By: *[signature]*
Donald J. Hayden, Bar No. 0097136
BAKER & MCKENZIE
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131-2827
Telephone: 305 789 8900
Facsimile: 305 789 8953

Attorneys for Plaintiff
Signatures Network, Inc.

#272336

MIADMS/272359.1

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**04-80295**

**I (a) PLAINTIFFS**

SIGNATURES NETWORK, INC.

**DEFENDANTS**

SLIPKNOT MERCHANDISING LLC, an Iowa limited liability company; JOHN DOES 1-10 and XYZ COMPANY,

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**CIV-RYSKAMP**

**(c) ATTORNEY (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)**
DONALD J. HAYDEN, ESQ.
BAKER & MCKENZIE
1111 BRICKELL AVENUE, SUITE 1700
MIAMI, FL 33131 – (305) 789-8900

04-80295-CV-KLR/AEV

**ATTORNEYS (IF KNOWN)**
Not known.

**MAGISTRATE JUDGE VITUNAC**

**(d) CIRCLE COUNTY WHERE ACTION AROSE:**
DADE, MONROE, BROWARD, **PALM BEACH**, MARTIN, ST. LUCIE, INDIAN RIVER, OKECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN X ONE BOX ONLY)

- ☐ 1. U.S. Government Plaintiff
- ☒ 3. Federal Question (U.S. Government Not a Party)
- ☐ 2. U.S. Government Defendant
- ☐ 4. Diversity (Include Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Case Only)
(PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated of Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTE UNLESS DIVERSITY.) Suit by exclusive licensee against infringer under the Lanham Act 15 USC §§1125(a) and 114 for emergency injunctive relief.

**IVa. 3 days estimated (for both sides) to try entire case**

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A CONTACT | A TORTS PERSONAL INJURY | | B FORFEITURE PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury-Med Malpractice | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 States Reappointment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personnel Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **A PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commercial/ICC Rates/etc B |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending B | ☐ 650 Airline Regs | ☒ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) B | ☐ 350 Motor Vehicle | ☐ 380 Other Personnel Property Damage | ☐ 660 Occupational Safety/Health | **B SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 690 Other | ☐ 861 HIA (1395___) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholder's Suits | ☐ 360 Other Personal Injury | | | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12USC3410 |
| ☒ 190 Other Contract | | | | ☐ 863 DIWC/DIWW(450(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | **A LABOR** | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| | | | ☐ 710 Fair Labor Standards Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **B PRISONER PETITIONS** | ☐ 720 Labor Management Relations B | | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor Management Reporting & Disclosure Act | **A FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure B | ☐ 442 Employment | Habeas Corpus | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Leases & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General* | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Employee Ret Inc Security Act B | | ☐ 890 Other Statutory Actions* *A or B |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other* | | ☐ 871 IRS-Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights *A or B | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2. Removed From State Court
- ☐ 3. Remanded from Appellate Court
- ☐ 4. Refiled
- ☐ 5. Transferred from another district (Specify)
- ☐ 6. Multidistrict Litigation
- ☐ 7. Appeal to district Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT**
CHECK IF THIS IS A ☐ UNDER F.R.C.P 23
CLASS ACTION
DEMAND $
☒ Check YES only if demanded in complaint
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See Instructions):
JUDGE ___N/A___    DOCKET NUMBER _____

DATE    March 31, 2004       SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F 1-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. 720169   Amount _____   M/ifp: _____
Date Paid: _____